M. H. RETTERATH, Appellant, v. A. L. SMITH, and SOUTHAM FARMERS GRAIN & TRADING COMPANY, a Corporation, and W. G. Stewart, Respondents.

(232 N. W. 606.)

Opinion filed October 21, 1930.

R. J. Downey, and Traynor & Traynor, for appellant.

F. R. Stevens, and Sinness & Duffy, for respondents.

NUESSLE, J. The plaintiff sued the defendant Smith and obtained a judgment. He garnished the Southam Farmers Grain & Trading Company, W. G. Stewart, and various other persons. The two garnishees named above filed and served affidavits denying liability and the plaintiff took issue thereon. The issues thus arising were tried together before the court without a jury. The court found for the garnishees and dismissed the proceedings. Plaintiff appeals.

The facts, so far as they are material to the issues in this case, may be stated briefly as follows: The defendant Smith was a large tenant farmer. He farmed lands belonging to numerous landlords. In some

cases he paid a cash rental and in some he delivered a portion of the crop. In some cases the landlords furnished the seed and paid their proportionate share of the expenses; and in other cases he furnished the seed himself and paid all the expenses connected with the venture. Smith did not prosper in his farming enterprise. In the spring of 1929 he was in serious financial difficulties—so serious that it was doubtful if he would be able to continue his operations that season.

The garnishee, The Southam Farmers Grain & Trading Company, is a corporation engaged in buying and selling grain and fuel at Southam, North Dakota. The garnishee, W. G. Stewart, is manager in charge of the trading company's business. He, J. G. Stewart, and Jack Stewart, are brothers. J. G. Stewart and the defendant Smith are brothers-in-law. Jack Stewart was the farm foreman working for Smith.

Smith had a large number of creditors. Some were secured and some unsecured. Among others he owed the garnishee, The Southam Grain & Trading Company, about $1600, which was unsecured. He owed the International Harvester Company, $28,000, secured by mortgage on his personal property; and he owed large amounts to various other creditors, some of whom were his landlords. In view of his financial condition and his apparent inability to carry on his farming enterprise in 1929, a meeting of his landlords or their representatives, and of a number of his larger creditors, was held in the spring of 1929. All were interested in having him continue his operations that year—his creditors, in the hope that he might discharge or reduce his indebtedness with them; and his landlords, so that they might have their lands farmed. His financial condition was considered at the meeting. Finally, in order to enable him to carry on, it was agreed that the creditors would forbear and that the landlords would make him advancements. The Trading Company agreed to make advances to the extent of $15,000, including the indebtedness Smith then owed it, and, in addition, to furnish seed for the lands farmed by him for which the landlords did not provide seed, on condition that he give the Trading Company a first mortgage on the crop as security for such indebtedness and advances, and that the Company be permitted to file seed liens for the seed so furnished. The Harvester Company agreed to forebear, on condition that it be given a second mortgage on the crop

as additional security for its indebtedness of $28,000. The several landlords agreed to make cash advances of from one to two and one-half dollars per acre, such advances to be secured under the terms of their several leases, which provided that title to all of the crops grown on their lands should be and remain in them until all obligations arising under the leases, including advancements made, should be paid. It was further agreed that W. G. Stewart, the manager of the Trading Company, should be the financial agent for all of the parties and that all advancements made should be made to him and that therefrom he should make such payments as were necessary to enable Smith to carry on the farming operations. It was further agreed that all crops grown during the season by Smith were to be turned over to Stewart as financial agent and that out of the proceeds thereof he should repay such advances as had been made, make such payments as were required to be made otherwise in carrying on the enterprise, and pay any balance that might remain to the Harvester Company to be applied on its indebtedness. Smith was to manage the farming operations. He was not, however, to receive any fixed salary but was to have such funds as would enable him to carry on, the same to be paid out of the financial agent's account. Accordingly, Smith executed the mortgages, the several landlords made the payments, aggregating several thousand dollars, to Stewart as agreed, and Stewart opened an account in the name of W. G. Stewart in the First National Bank of Crary, wherein these payments were deposited.

Pursuant to this arrangement Smith continued his farming operations. He planted and harvested some 5,000 acres of wheat and barley. Incidentally, and as indicating the magnitude of his operations, it is to be noted that the harvesting was done by 14 horse-drawn and 3 tractor outfits. The Trading Company made advances, including the original indebtedness, of nearly $15,000. It furnished seed, for which liens were filed, for $6,200. Came threshing time, and the advances were practically exhausted. The crop had to be threshed. Smith had 3 threshing outfits. There were no funds with which to operate them, so with the consent of W. G. Stewart, Smith on August 12 made an arrangement with J. G. Stewart whereby the latter leased the 3 outfits belonging to Smith, stipulating in the lease that he would thresh Smith's grain at the going price, giving preference to such threshing

86

and doing the same whenever required. The threshing was done pursuant to this arrangement. The thresh bill was $11,691.08. J. G. Stewart filed threshing liens therefor. The grain as it was threshed was hauled to the Trading Company's elevator. The hauling was done mostly by truck. The charge for this hauling was $2,410.58. W. G. Stewart, as financial agent, paid for the hauling and charged the amount of the payments against the farming operations. Likewise he paid the thresh bills, paid and discharged the seed liens, and paid the several landlords the advancements made by them and the cash rentals pursuant to the terms of their leases. Smith's share of the grain was sold as it was delivered to the elevator and the proceeds appropriated by W. G. Stewart as financial agent. The total amount received for the tenant's share of the crop was $53,119.65.

After the arrangement was made whereby W. G. Stewart became the financial agent for all of the interested parties, he authorized the defendant Smith, and Jack Stewart, Smith's foreman, to draw checks on his account in the First National Bank of Crary for expenses attendant on, and necessary in, the farming operations. He also authorized Smith to draw checks for such amounts as were necessary for his personal and family expenses. Pursuant to the authority thus given, Smith drew checks aggregating $4,006.60, and Stewart $9,982.82.

Smith was also largely indebted to the plaintiff. The plaintiff, however, was not a party to the conference of creditors and landlords, nor did he assent to any agreement there reached. Why he did not participate is not disclosed by the record. He sued Smith. Service of the summons and complaint was made on April 4, 1929, and on November 19, 1929, he entered judgment against Smith for $8,667.37. He also instituted garnishment proceedings. Service of the garnishment summons was made on the Trading Company and on Stewart on September 16, 1929. On that date the balance in the W. G. Stewart account in the First National Bank of Crary was $1,119.75. Thereafter this account was replenished by deposits of moneys from grain sold and Smith and Jack Stewart continued to draw on the account. The checks thereafter drawn by Jack Stewart aggregated $3,015.56, and by Smith, $1,008.44. After service of the garnishment summons on September 16, and before the final disclosure was made, the Trading Company for Stewart, or Stewart, received and sold a large amount of grain

from the farming operations and Stewart made payments in large amounts for advancements and other items pursuant to the agreement theretofore made. He also paid J. G. Stewart the threshing bill above mentioned and paid the bill for hauling the grain to market. In addition, he paid the Harvester Company on their account, and as the net proceeds of the farming undertaking, one payment of $5,000, and a final payment of $1,550.

J. G. Stewart paid Smith as rental for the threshing outfits pursuant to the written agreement heretofore referred to, $1,500.

The garnishment issues were tried to the court without a jury. The trial court found the facts to be substantially as stated above and ordered judgment in favor of the garnishees and dismissing the garnishments. Judgment was entered accordingly. Thereupon the plaintiff perfected the instant appeal.

The single question presented in this appeal is as to whether at the time the garnishment summons was served or thereafter before the affidavits denying liability were made and filed, Stewart or the Trading Company had money or property in their hands belonging to Smith and subject to garnishment.

Section 7567, Comp. Laws 1913, provides:

"Any creditor shall be entitled to proceed by garnishment . . . against any person . . . who shall be indebted to or have any property whatever, real or personal, in his possession or under his control belonging to such creditor's debtor. . . ."

Section 7583, Comp. Laws 1913, provides:

"From the time of the service of the summons upon the garnishee he shall stand liable to the plaintiff to the amount of the property, money, credits and effects in his possession or under his control belonging to the defendant, or in which he shall be interested, to the extent of his right or interest therein, and of all debts due or to become due to the defendant, except. . . ."

As was said in Hatcher v. Plumley, 38 N. D. 147, 164 N. W. 698:

"The manifest purpose of garnishment process, and the intent of the legislature as evinced by these statutory provisions, is to subject the property owned by, or debts due to, a defendant in an action, to the payment of the judgment obtained therein. But it is equally evident that only the actual interest of the defendant in such property or in-

debtedness can be reached by such garnishment proceedings. The creditor cannot by garnishment obtain any more than actually belongs to his debtor. The rights of the debtor are the source of the creditor's rights. The stream cannot rise higher than its source. And if there are any legal or equitable bars standing in the way of the defendant enforcing his right or interest against the garnishee (or claimants interpleaded), the same bars will stand in the way of the plaintiff in the garnishment action. The plaintiff in a garnishment action at the most becomes subrogated to the rights of the defendant in the main action. If it appears that for some reason the defendant in the main action could not successfully have maintained an action in his own name for his own use against the garnishee defendant by reason of the rights of the garnishee, or some third person, manifestly, these rights will equally bar the rights of the plaintiff. Under no circumstances can the plaintiff be placed in a more favorable, or the garnishee in a worse, position than if the defendant was himself enforcing his claim. Smith v. Clarke, 9 Iowa, 241, 245. For the plaintiff cannot by garnishment place himself in a superior position as regards a recovery than is occupied by the principal defendant. The garnishee's liability is measured by his responsibility and relation to the defendant. And he can be charged only in consistency with the subject of his contract with the defendant. And if, by any pre-existing bona fide contract, his accountability has been removed or modified, it follows that the garnishee's liability is correspondingly affected. The garnishment cannot change the nature of a contract between the garnishee and the defendant, nor prevent the garnishee from performing his contract with third persons. Shortridge v. Sturdivant, 32 N. D. 154, 158, 155 N. W. 20; Shinn, Attachm. & Garnishment, § 516; Petrie v. Wyman, 35 N. D. 126, 159 N. W. 616."

On this appeal plaintiff complains particularly concerning four items. He insists that at the time the garnishment summons was served or before the affidavits denying liability were made and filed, Stewart or the Trading Company had money or property in their hands belonging to Smith of value largely in excess of the amount of his judgment. He contends, first, that the money in the Stewart account in the First National Bank of Crary was in fact Smith's money though deposited in the name of Stewart, and that, in any event, the

amount remaining in that account on September 16 was subject as such to the lien of the garnishment. He further contends that the alleged arrangement between J. G. Stewart and Smith with respect to the threshing outfits was really a subterfuge and cover resorted to in order to enable Smith to file liens for the threshing and to be paid therefor, and so the payment made by W. G. Stewart of this threshing bill was not a proper payment and that Stewart should be responsible therefor. He further contends that the payment of $2,400 for hauling the grain to market was not a proper payment and that Stewart is likewise responsible for it. Finally he insists that the final payment of $1,550 made to the International Harvester Company was made with Smith's money in Stewart's hands and that this item was also improperly paid with moneys subject to the lien of the garnishment.

The trial court ruled against the plaintiff's contentions with respect to these various matters. We think he was right in doing so. It is true that W. G. Stewart permitted Smith and his foreman Jack Stewart to draw checks on the account in the Crary bank. But the farming operations had to be carried on. Money was required for wages and for a multitude of other expenses. Provisions had to be bought and prepared. A large crew of men was necessarily engaged in carrying on this extensive enterprise. W. G. Stewart had confidence in Jack Stewart and in Smith so he permitted them to draw as funds were required, directing the bank to pay. We have scrutinized the items in so far as we could ascertain what they were from the evidence in the record, and can see nothing indicating that they were not proper items to be paid out of this account and chargeable against the farming operations. It is true that some of the checks were for cash, apparently for Smith or some of the members of Smith's family, but Smith and his family had to live. Some money was required for them and Stewart was the judge as to what was necessary and proper. The money came either from advances made by those participating in the spring meeting or as the proceeds from the grain raised by Smith. Only those who made advances could complain as to the disposition by Stewart of the money thus advanced. The Southam Trading Company and the International Harvester Company had prior liens on the crop grown much greater in amount than the net proceeds of the crop. The crop was turned over to Stewart for them and became theirs when so turned.

over, subject to such charges as they had contracted might be made therefrom by Stewart. They alone could complain if the moneys thus derived were misappropriated; and they make no complaint.

We have considered the plaintiff's challenge to the good faith of the transaction between J. G. Stewart and Smith with respect to the threshing outfits. We see nothing indicating bad faith. Indeed, the contrary is clearly indicated. Smith had no funds. It was necessary to have the grain threshed. The advancements available in W. G. Stewart's hands were practically exhausted. J. G. Stewart was an experienced thresherman. Under the circumstances it was desirable, so far as W. G. Stewart was concerned, to have such an arrangement made. The aggregate of the thresh bill is large, but it was an item of expense which had to be incurred. If Smith could not do the threshing, and he could not unless W. G. Stewart for the landlords and creditors underwrote and paid the bills, someone else had to be found to do it or the whole undertaking would abort. The situation was as broad as it was long. The threshing was paid for at the current rate. It would have had to be paid for whoever did the threshing. By the plan adopted, W. G. Stewart was spared much trouble and no little hazard. The arrangement was in accord with reasonable business management.

Likewise with respect to the charge for hauling the grain. It was necessary that the grain be taken to market. Someone had to do it. Who did do it does not appear. Stewart had it done and paid for it with money which was his for that purpose. The amount was reasonable and proper for the service. And the grain in the elevator was worth more than in the fields where it was threshed, in exactly the amount of the hauling charges.

Lastly, with respect to the money paid to the International Harvester Company. It is conceded that the Trading Company was entitled to be reimbursed for the advancements it had made. The Trading Company had a first mortgage on the crop. The agreement was that all its advances, including the indebtedness of $1,500 which Smith owed it at the time of the spring meeting, should be paid. Likewise all other legitimate charges and expenses were to be paid, and whatever balance remained was to be paid to the International Harvester Company. That balance was $6,550, the amount paid to it, and that is all

the Harvester Company received, though its claim was more than $28,000. The Harvester Company had as security a second mortgage on the crop. Under the arrangement the grain became Stewart's for the purpose of enabling him to discharge these various obligations. Smith no longer had any interest in it other than to see that the proceeds thereof were properly applied. It was not his. He had nothing to say as to the disposition that should be made of it. That was settled at the spring meeting. Smith having no interest in either the grain or its proceeds, there was nothing to which the lien of the garnishment could attach.

The judgment is affirmed.

Burke, Ch. J., and Burr, Birdzell and Christianson, JJ., concur.